[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-10315
_____

SHKELZEN BERISHA,

Plaintiff - Appellant,

versus

GUY LAWSON,
ALEXANDER PODRIZKI,
SIMON & SCHUSTER, INC.,
RECORDED BOOKS, INC.,

Defendants - Appellees.

_____

On Appeal from the United States District Court
for the Southern District of Florida
_____

(September 2, 2020)

Before MARTIN, NEWSOM, and O'SCANNLAIN,* Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We must decide whether the son of the former Prime Minister of Albania, who alleges that he was defamed in a book that accused him of being involved in an elaborate arms-dealing scandal in the early 2000s, may succeed in his defamation action against the book's author and its publisher.

I

This case arises out of brief references to Shkelzen Berisha—the son of the former Prime Minister of Albania, Sali Berisha—in Guy Lawson's 2015 book *Arms and the Dudes: How Three Stoners from Miami Beach Became the Most Unlikely Gunrunners in History*.  The book tells the supposedly true story of Efraim Diveroli, David Packouz, and Alex Podrizki, three young Miami, Florida, men who became international arms dealers during the early 2000s.

A

We recount the tale as it is presented in Lawson's book.  According to the book, in the early 2000s, Diveroli, a teenager in Miami, came up with a plan to open a business specializing in arms trading in order to fulfill defense contracts with the United States government.  At that time, private companies were

_____

* Honorable Diarmuid F. O'Scannlain, United States Circuit Judge for the Ninth Circuit, sitting by designation.

permitted to bid on large military contracts through a website operated by the federal government, FedBizOpps.com. Diveroli was originally inspired to enter the trade after working for his uncle's arms company while living with him for a few years in Los Angeles. After a falling out with his uncle, Diveroli returned to Miami and convinced his father to sell him an unused shell company to build his own arms-trading enterprise: AEY, Inc. Diveroli had significant early success bidding on small contracts unlikely to attract the attention of major arms dealers, and he quickly grew both his business's capital and his own connections with arms vendors. Eager to see his operation expand, Diveroli later brought on his childhood friend David Packouz to help him run the business.

Much of the book, and Berisha's alleged involvement in the operation, revolves around AEY's biggest procurement deal: a roughly $300 million contract that AEY won in the summer of 2006 to equip Afghan security forces fighting the Taliban. The contract required AEY to ship 100-million rounds of AK-47 ammunition to Afghanistan. At the time, AEY had a deal with a Swiss middleman, Heinrich Thomet, who had access to surplus ammunition in Albania that AEY could purchase at low prices. Thomet had purchased the ammunition through the Military Export Import Company ("MEICO"), an Albanian state-owned arms-dealing company. Packouz hired another childhood friend, Alex Podrizki, to travel to Albania, to collect the ammunition, and to load it onto planes to Afghanistan.

In Albania, Podrizki inspected the ammunition and found it packed in Chinese crates—potentially raising a significant issue, because federal regulations barred AEY from fulfilling the contract with Chinese ammunition. Packouz and Diveroli decided to use the ammunition anyway, with a plan to repackage the rounds to conceal their Chinese origin. AEY hired Albanian businessman Kosta Trebicka to coordinate the repackaging job. In the course of his work, Trebicka discovered that Thomet—the middleman between AEY and the Albanian state-owned MEICO—had charged AEY nearly twice the price he paid to MEICO for the ammunition.

According to Lawson's book, in May 2007, after Trebicka told Diveroli of the overcharges, Diveroli flew to Albania to renegotiate the price and to attempt to remove Thomet from the deal. Diveroli's supposed trip to Albania in 2007 is the subject of significant dispute by the parties here. According to the book, Diveroli and Podrizki met with Ylli Pinari, the director of MEICO, who drove the pair to an abandoned, half-completed building in Tirana, where he introduced them to Mihail Delijorgji. Delijorgji is described in the book as a "hard-looking" man who offered to lower the AEY's price if his own company were paid to repackage it instead of Trebicka's. As Lawson tells it, the Americans also saw another man, who appeared to be in his mid-20s, who was never introduced and who remained silent throughout. According to the book, Diveroli and Podrizki would later learn

4

that this man was Berisha and that the entire operation was involved in organized crime.  The relevant passages in the book read (with emphasis to the portions relating to Berisha added):

> Ylli Pinari escorted Diveroli and Podrizki to . . . an abandoned construction site for a partially completed office building.  Pinari led the pair up a set of stairs and along a corridor until they reached a door.  Stepping inside, they found . . . a hard-looking man—a real thug, Podrizki thought, fear rising. . . .
>
> This was Mihail Delijorgji.  *Diveroli and Podrizki then turned to see a young man around their age sitting in the corner.  Dressed in a baseball cap and a sweater, he had dark hair, a soft chin, and sharklike eyes.  He wasn't introduced.  This was Shkelzen Berisha, the son of the prime minister of Albania, they would later be told by Pinari.  Shkelzen was part of what was known in Albania as "the family," the tight-knit and extremely dangerous group that surrounded and lived at the beneficence of the prime minister, Sali Berisha. . . .*
>
> Delijorgji said that if Diveroli wanted a discount he would have to change the arrangements for the repackaging operation . . . by giving the contract to repack to Delijorgji's company.  *The son of the prime minister remained silent. . . . .*
>
> Diveroli and Podrizki departed.
>
> "That guy looked stupid enough to be dangerous," Diveroli said of Delijorgji.
>
> *"Did we just get out of a meeting with the Albanian mafia?"* Podrizki joked.
>
> *"Absolutely.  Absofuckinglutely."*

Ultimately, the group brokered a deal to purchase the ammunition at a discount, cutting Trebicka out of the scheme in favor of Delijorgji.  Angered at

5

being removed from the deal, Trebicka sought to blow the whistle on kickbacks that he believed Diveroli and AEY were paying to Albanian officials. Hoping to substantiate his claims, Trebicka recorded a telephone call with Diveroli, in which Diveroli told him that he could not help bring Trebicka back into the scheme because the corruption "went up higher, to the prime minister, to his son."

Trebicka's allegations—and his recorded conversation with Diveroli—became the source of a number of public reports about AEY's illegal scheme. Most notably, on March 27, 2008, the *New York Times* published a front-page story, which reported the allegations that AEY had illegally trafficked in Chinese ammunition and paid kickbacks to Albanian officials, including Pinari and Minister of Defense Fatmir Mediu.  The story quoted Diveroli's statements that the scheme "went up higher to the prime minister and his son" and that Berisha was part of "this mafia."  The article also reported on another recent matter Trebicka had blown the whistle on (and accused Berisha of being involved in): the tragic explosion of an Albanian munitions stockpile, which had killed 26 people in the village of Gerdec and for which Delijorgji and Pinari had been arrested.  Several months later, the *New York Times* ran another article that reported the supposedly accidental death of Trebicka, and detailed suspicions that Trebicka had actually been murdered—perhaps with the involvement of the Berisha family—to prevent him from testifying about the AEY and Gerdec matters.  Once again, the *Times*

story quoted Diveroli's statement about the corruption going "all the way up" to Berisha.

At the same time, federal agents were investigating AEY for violating the embargo against shipping Chinese ammunition. On August 23, 2007, federal investigators raided AEY's offices in Miami while Podrizki was still abroad in Albania. In 2008, federal prosecutors charged Diveroli, Packouz, and Podrizki with defrauding the United States government. All three pled guilty and were convicted; Podrizki and Packouz were sentenced to house arrest, while Diveroli was sentenced to four years in prison.

B

Lawson first published an account of the AEY saga in a March 2011 feature article in *Rolling Stone*, entitled "Arms and The Dudes: How Two Stoner Kids from Miami Beach Became Big Time Arms Dealers – Until the Pentagon Turned on Them." It was told largely from "the dudes'" perspective, whom Lawson found to be quite unlike the "hardened criminals" that the *New York Times* coverage and federal government had portrayed them to be. Relevant here, like the *New York Times* story, Lawson's article reported that AEY's deal to purchase ammunition from MEICO was structured to pay kickbacks to Albanian government officials and quoted Diveroli's statement that the scheme went "up higher to the prime minister and his son." Lawson's article also reported that the repackaging job was

7

transferred to "a friend of the president's son."  Though he was aware of the article, Berisha never sued Lawson or *Rolling Stone* for anything printed in the article.

Following the success of the article, Simon & Schuster, Inc., entered into a publishing agreement with Lawson to expand the story into a non-fiction book. After four years of additional research, including interviews with Podrizki and Packouz (who were paid life rights for the story), Lawson published his full account of the saga in his June 2015 book.  He also sold the movie rights to Warner Brothers, which turned the story into the 2016 major motion picture *War Dogs*, starring Jonah Hill and Miles Teller.

C

On June 8, 2017, Berisha sued Lawson, Diveroli,[1] Podrizki, Packouz, and Simon & Schuster, and also named Recorded Books, Inc., which was responsible for producing the audio version of Lawson's book.  The complaint alleges that Berisha was defamed by a few scattered references to him in Lawson's book.  In addition to the passage about the 2007 meeting in Tirana quoted above—which, as Berisha emphasizes on appeal, is the core of his allegations—the complaint also takes exception with the following references:

- On page 150, the book states that "Diveroli had agreed to cut Trebicka out of the repacking job, which was now being done by a company

---

[1] Diveroli was later dismissed from the lawsuit following a settlement.

called Alb-Demil, an entity seemingly controlled by the prime minister's son and Mihail Delijorgji."

- On page 160, the book quotes the conversation that Trebicka recorded with Diveroli, and which was featured in the 2008 *New York Times* article. In that conversation, Diveroli said, "The more it went up higher, to the prime minister, to his son—this Mafia is too strong for me. I can't fight this Mafia. It got too big. The animals got too out of control."

- The book features a photo of Berisha with the caption: "Also involved, the dudes discovered, was the prime minister's son, Shkelzen Berisha."

Over the next year, the parties conducted extensive discovery, in which the defendants assert they produced nearly 20,000 documents, including all of the research relied upon by Lawson in writing his book and nearly all communications relevant to the book's editorial process. On July 13, 2018, however, Berisha moved to compel production of additional communications that were exchanged between Lawson and Simon & Schuster's attorneys as part of the publishing house's legal pre-publication review. A magistrate judge denied that motion, finding the materials to be privileged after viewing the defendants' privilege log and viewing some of the documents in camera.

D

9

Following discovery (which was twice extended),[2] the defendants moved for summary judgment, arguing that there was not sufficient evidence to allow a reasonable juror to conclude that Lawson or the other defendants had defamed Berisha. The district court agreed and granted summary judgment against Berisha.

Berisha timely appealed.

## II

Berisha first challenges the district court's findings as to the merits of his claims. Specifically, the court found that Berisha is a "limited public figure for purposes of the controversy at issue in this case," and that he therefore can prevail only by demonstrating that the defendants acted with "actual malice" against him. The court then granted summary judgment against Berisha, finding that the evidence in the record could not reasonably support the conclusion that the defendants had acted with such malice.

Berisha argues that the district court erred both: (1) in requiring him to show actual malice in the first place and, even if that were the correct standard to apply, (2) in concluding that the record evidence could not support such a finding.

## A

---

[2] The district court extended the discovery deadline (once on a joint motion and once at Berisha's request) a total of two months—from June 1, 2018, ultimately to August 1, 2018. Two weeks before discovery was set to close (and three weeks before summary judgment motions were due), Berisha sought even more time to take discovery. The court denied the motion but permitted the parties to "agree to conduct discovery beyond the discovery deadline."

We first ask: is Berisha a public figure for purposes of his defamation suit?

Because of the expressive freedom guaranteed by the First Amendment, a defendant may not be held liable for defaming a public figure about a matter of public concern unless he is shown to have "acted with actual malice." *Silvester v. Am. Broad. Cos.*, 839 F.2d 1491, 1493 (11th Cir. 1988); *see generally N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270–83 (1964). Berisha does not dispute that Lawson's book concerned matters of public interest; the only question is whether the district court erred in finding him to be a "public figure." An individual may qualify as a public figure either generally—that is one with such fame and notoriety that he will be a public figure in any case—or for only "limited" purposes, where the individual has thrust himself into a particular public controversy and thus must prove actual malice in regard to certain issues. *Turner v. Wells*, 879 F.3d 1254, 1272 (11th Cir. 2018). Here, the district court found that Berisha fell within the second category—a public figure at least for the limited purpose of this lawsuit.

We apply a two-part test to determine whether someone is a limited public figure: "First, [we] must determine whether the individual played a central role in the controversy. Second, [we] must determine whether the alleged defamation was germane to the individual's role in the controversy." *Id.* at 1273 (citations omitted). Two "fundamental" criteria help draw the line between public and

11

private figures: (1) "public figures usually have greater access to the media which gives them a more realistic opportunity to counteract false statements than private individuals normally enjoy"; and, more importantly, (2) public figures typically "voluntarily expose themselves to increased risk of injury from defamatory falsehoods." *Silvester*, 839 F.2d at 1494 (internal quotation marks omitted).

Lawson suggests that Berisha—who according to one survey in our record had one hundred percent name recognition in Albania—might qualify as a public figure generally. Putting that question aside, we agree with the district court that he at least is a public figure for the limited purpose of this lawsuit. As described above, the lawsuit concerns whether Berisha was defamed in Lawson's description of AEY's involvement in a corrupt scheme to defraud the United States in conjunction with certain Albanian government officials and an Albanian "mafia." Berisha's purported role in that scheme was covered by news media in both Albania and the United States—including in two *New York Times* stories reporting Berisha's supposed connections to the AEY deal and to a so-called Albanian mafia. These same matters were also addressed in a television documentary produced by Al Jazeera, which covered, among other things, Berisha's supposed role in corrupt arms dealing and in the Gerdec explosion.

Berisha contends that he cannot be a public figure because he did not *voluntarily* insert himself into the publicity surrounding these affairs. But the

record shows that Berisha did indeed place himself in the public eye regarding the Albanian arms-dealing scandal. Of course, if the many press reports about his involvement in that affair are true, then there can be no doubt he entered into the matter voluntarily. But even putting aside the truth of such reports, Berisha undoubtedly forced himself into the *public debate* over his supposed involvement in these activities. First, he admits that he privately met with Kosta Trebicka in an effort to convince him that he was not involved in the AEY matter—and that shortly thereafter Trebicka produced a statement "to the media" retracting his allegations against Berisha. Berisha also admits that he contacted a group of "media representatives" to request that they publish a statement presenting what he called the "truth [of] the accusations against me," which explicitly "encourage[d] the press to follow this story to the end and investigate it." We have recently held that an individual may insert himself into a controversy—and thus become a public figure with respect to that controversy—by encouraging third parties to make public statements in his defense and by inviting further public attention in an effort to influence the debate. *See Turner*, 879 F.3d at 1273.

Moreover, even if Berisha never voluntarily sought public attention, federal courts have long made clear that one may occasionally become a public figure even if "one doesn't choose to be." *Rosanova v. Playboy Enters., Inc.*, 580 F.2d 859, 861 (5th Cir. 1978); *see also, e.g.*, *Turner*, 879 F.3d at 1273 (citing

13

approvingly the statement that "[i]t may be possible for someone to become a public figure through no purposeful action of their own" (internal quotation marks omitted)).  As this circuit[3] once put it, the "purpose served by [the public figure standard] would often be frustrated if the subject of publication could choose whether or not he would be a public figure.  Comment upon people and activities of legitimate public concern often illuminates that which yearns for shadow." *Rosanova*, 580 F.2d at 861; *see also Silvester*, 839 F.3d at 1496 (where a person "involuntarily and, against his will, assumes a prominent position" in the outcome of a public controversy, will be treated as a public figure "[u]nless he rejects any role in the debate").  Berisha argues cases of involuntary public figures must be kept "exceedingly rare," *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974), and refers us to a decision from the Fourth Circuit in this regard.  *See Wells v. Liddy*, 186 F.3d 505, 539 (4th Cir. 1999) ("[B]ecause the usual and natural conception of a public figure encompasses a sense of voluntary participation in the public debate, . . . the class of involuntary public figures must be a narrow one . . . .").  But Berisha's is exactly the rare case in which courts recognize involuntary public-figure status.  The purposes underlying the public figure doctrine apply unequivocally to Berisha: he was widely known to the public, he

---

[3] *Rosanova* is a Fifth Circuit case from shortly before that circuit was divided, making it precedential for today's Eleventh Circuit.  *See Bonner v. City of Pritchard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

14

had been publicly linked to a number of high-profile scandals of public interest, he availed himself of privileged access to the Albanian media in an effort to present his own side of the story, and he was in close proximity to those in power. Even under the Fourth Circuit case that he invokes, Berisha would still be regarded as a public figure. *See id.* (individual may be involuntary public figure where she has "sought to publicize her views on the relevant controversy" or "has taken some action . . . in circumstances in which a reasonable person would understand that publicity would likely inhere").

The district court was correct to apply the heightened defamation standard for claims brought by public figures.

B

Next, did the district court err in finding that there was insufficient evidence to support Berisha's claim that the defendants acted with actual malice?

Because Berisha is a public figure, he cannot prevail in this suit unless he shows, by clear and convincing evidence, that the defendants acted with actual malice toward him. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 659 (1989). That is, he must be able to show—well beyond a preponderance of the evidence—that the defendants published a defamatory statement either with actual knowledge of its falsity or with a "high degree of awareness" of its "probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). It is a subjective test,

15

which asks whether the publisher *"in fact* entertained serious doubts as to the truth of his publication." *Silvester*, 839 F.2d at 1498 (emphasis added) (internal quotation marks omitted); *see also St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (standard "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing"). Even an "extreme departure from professional [publishing] standards" does not necessarily rise to the level of actual malice. *Harte-Hanks*, 491 U.S. at 665.

Thus, the question here is whether the record could allow a reasonable juror to conclude (clearly and convincingly) that Lawson held serious doubts about the truth of the book's portrayal of Berisha as involved in the AEY scheme.

1

Although Berisha has little evidence to suggest Lawson knowingly published falsehoods about him, Berisha argues that a juror could reasonably find that Lawson at least held serious doubts about his portrayal of Berisha, because he knew better than to trust his firsthand sources for that account: primarily the three "dudes." For his part, Lawson testified that he *did* believe his sources, and that in particular he found Podrizki and Packouz to be "extremely reliable," with information that consistently matched the other evidence available. But, as Berisha points out, these were not the most dependable individuals. They had been convicted of fraud, Packouz and Podrizki were self-interested in providing Lawson

16

with a profitable story, and, in the book, Lawson himself describes Diveroli as "a liar . . . [who] misled directly, indirectly, compulsively." Thus, Berisha argues, evidence of Lawson's awareness of these many credibility flaws could clearly show that Lawson must have doubted what they said about Berisha. Berisha, however, greatly overstates the significance of such evidence.

a

First, though factors like those Berisha identifies might undermine a source's credibility, they do not show that a publisher necessarily acted with malice by relying on the source. *See, e.g.*, *Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1045 (10th Cir. 2013) ("That Bensinger knew Wilson . . . may have been biased . . . is not evidence Bensinger had obvious reasons to doubt Wilson's veracity or the accuracy of his report."); *Cobb v. Time, Inc.*, 278 F.3d 629, 638 (6th Cir. 2002) (publisher could rely on paid source who was a drug user with a "criminal background"); *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 715 (4th Cir. 1991) ("Actual malice cannot be proven simply because a source of information might also have provided the information to further the source's self-interest."). Further, Lawson's book explicitly informed the reader of these supposed problems with the men's credibility, describing them as young partiers who drank, used drugs, and committed a major international fraud. With regard to Diveroli, the book explicitly described his penchant for lying in order to further his

17

own interests.  In other words, the book makes clear that the account offered by these men might be dubious.  As we have recently recognized, where a publisher in this manner "inform[s] its audience that its primary source [is] not an unimpeachable source of information, it serve[s] to undermine claims showing that the report was issued with actual malice."  *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016) (internal quotation marks omitted).

b

Second, whatever one might say about the "dudes'" credibility, Lawson did not rely solely on their assertions about Berisha but rather found their stories corroborated by several other sources.

Most obviously, Lawson relied on the many prior published reports that had similarly accused Berisha of being involved in the AEY fraud and in an Albanian criminal underworld.  These include: at least four published news articles, including two in the *New York Times*, two separate books (one published in the United States and one in Albania), leaked diplomatic cables published on WikiLeaks,[4] and the investigative report by Al Jazeera.  The law is clear that individuals are entitled to rely on "previously published reports" from "reputable sources" such as many of these.  *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d

---

[4]  These leaked cables purport to show John Withers, the then-U.S. Ambassador to Albania, reporting allegations that Berisha had personally been involved in the Gerdec matter.

1287, 1297 (D.C. Cir. 1988). Thus, as the district court recognized, Lawson's reliance on these many independent sources, alone, should defeat any claim of actual malice. *See Rosanova*, 580 F.2d at 862 ("[S]ubjective awareness of probable falsity . . . *cannot be found* where, as here, the publisher's allegations are supported by a multitude of previous reports upon which the publisher reasonably relied." (emphasis added)).

Further, Lawson interviewed several additional sources who corroborated the claims about Berisha. For example, Erion Veliaj, the mayor of Tirana, told Lawson that the Berisha family was like a "wolf pack" that used individuals like Delijorgji to protect Shkelzen and that he was not surprised to hear that Berisha was involved in the AEY deal. Likewise, Trebicka's daughter told Lawson that she believed her father had been removed from the AEY deal in order to make way for "Berisha's son" and that she considered Berisha to be a suspect in her father's mysterious death. Finally, Andy Belliu, a former worker at the Gerdec factory, called Berisha the "shadow" behind the factory and implicated him in "mafia" dealings.

Berisha contends that these additional sources had their own credibility problems, for example suggesting that the prior publications themselves all trace back to Diveroli or that the other individuals were biased against him and his father. But even if that is so, it was not Lawson's (perhaps impossible) duty to find

19

only pure, unimpeachable sources of information.  Even if Berisha might nitpick each source for one reason or another, this wealth of evidence considered altogether does not permit a reasonable juror to find clear and convincing proof that Lawson held serious doubts about the depiction of Berisha in his book.

2

In addition to his attacks on the credibility of Lawson's sources, Berisha argues that he can show Lawson exhibited a general pattern of dishonesty in his book, which—when considered "in the aggregate"—undermines the notion that Lawson actually believed his portrayal of Berisha.  Again, Berisha overstates the significance of such evidence, which is largely irrelevant to the truth of the claims made about him in the book.

a

First, Berisha asserts that evidence shows that Lawson was determined to publish a preconceived story about him, regardless whether it could be supported. He quotes Lawson as boasting at various times that his forthcoming book might "bring down the Prime Minister of Albania."  But each of these quoted emails was sent by Lawson *after* he had done substantial work on the book.  In other words, such statements do nothing to show that Lawson *began* with an unfounded plan to take down Berisha and his father, but rather reflect only that *after* Lawson had reported and begun writing the book he believed that the story he had discovered

might do so.  Accordingly, this evidence offers no reason to doubt the sincerity of

Lawson's belief in the many sources that corroborated his depiction of Berisha.

b

Second, Berisha argues that evidence shows that Lawson intentionally

fabricated at least two details in the book.  But even if that were true, neither minor

detail would reasonably cast doubt on whether Lawson harbored serious doubts

about his broader depiction of Berisha.

i

First, Berisha claims that Lawson made up the fact that specifically Ylli Pinari

told Podrizki and Diveroli that Berisha was present at their Tirana meeting.  The

passage in question reads (with emphasis added):

> Diveroli and Podrizki then turned to see a young man around their age
> sitting in the corner.  Dressed in a baseball cap and a sweater, he had
> dark hair, a soft chin, and sharklike eyes.  He wasn't introduced.  This
> was Shkelzen Berisha, the son of the prime minister of Albania, *they
> would later be told by Pinari.*

Berisha argues that the Pinari attribution is not sourced to anyone other than

Diveroli (whom, again, he casts as utterly unreliable).  He points out that, at least

according to Podrizki, Berisha was identified to them by Trebicka, not Pinari.  And

because Lawson himself admitted that Trebicka would not have known whether

Berisha attended the Tirana meeting, Berisha argues that a "reasonable jury could

21

conclude that Lawson manufactured the provenance of his information (*i.e.*, Pinari) to hide the unreliability of his actual 'sourcing'"—i.e., Diveroli.

Even if we assume that Lawson did fabricate the Pinari detail,[5] that still would not be enough to demonstrate he acted with actual malice. As the district court recognized, under applicable Florida law,[6] the key question in a defamation case is whether the "gist or sting" of the challenged statements was defamatory. *Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230, 1240 (11th Cir. 1999). The "gist" and "sting" of Lawson's depiction of Berisha was that he was involved in the ammunition repackaging fraud and, more broadly, with an Albanian criminal underworld. The gist does not include which of the many individuals involved in the scheme first identified Berisha's presence to the Americans. Indeed, as written, the book still conveys the undisputed truth that Diveroli and Podrizki said they were told secondhand that Berisha was present at their meeting. At worst, the book misidentifies where *they* claimed to have received such information.

The general irrelevance of this minor detail is apparent when considered in context. The sentence in the book with which Berisha takes issue reads: "This was

_____

[5] Lawson of course disputes this, and the record certainly does not prove that Lawson *did* fabricate the attribution of the identification by Pinari. Lawson argues that the attribution to Pinari was his own conclusion as the most likely source following his research.

[6] Florida law governs the merits of Berisha's defamation action, though standards for public figures and "actual malice" derive from the First Amendment and thus, as discussed above, are matters of federal law. *See, e.g.*, *Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 956 (8th Cir. 2020).

22

Shkelzen Berisha, the son of the prime minister of Albania, [Diveroli and Podrizki] *would later be told by Pinari*."  We agree with the district court that the overall "gist" of the book's depiction of Berisha would not materially change if instead that sentence simply read: "This was Shkelzen Berisha, the son of the prime minister of Albania, Diveroli and Podrizki *would later be told*."[7]

ii

Second, Berisha claims that Lawson "deliberately falsified" an interview between Albanian Defense Minister Fatmir Mediu and *New York Times* reporter Nicholas Wood, in an effort to "reinforce his claim of Berisha's involvement with AEY."  The passage in question details an interview during which Wood prodded Mediu with questions about, among other things, Albanian officials' involvement in the AEY scandal.  At one point, according to Wood, Mediu burst out in anger after Wood asked a question about Mediu's previous conviction on drug charges.

---

[7] Along similar lines, Berisha makes much of the fact that Lawson originally hoped to include the following sentence in his description of a meeting between *New York Times* journalist Nicholas Wood and Kosta Trebicka: "The head of MEICO Ylli Pinari had told Trebicka that the Prime Minister's son was involved in the AEY contract . . . ."  At one point, Lawson shared that passage with Wood, out of concern that the claim "might be a slight stretch," depending on what Trebicka discussed with Wood.  No response to that email is included in the record, but in the final version of the book, Lawson omits any reference to Pinari and instead simply says that "Trebicka had heard the allegation that the prime minister's son was involved in the AEY contract."

Berisha suggests that Lawson's hope to include a "stretched" reference to Pinari shows that Lawson planned to put "dramatic effect" before "the truth."  But, as Lawson points out, the fact that he ran this passage by Wood *before* publishing—and then subsequently edited it— shows exactly the opposite.  This sort of fact checking is exactly what Berisha suggests Lawson should have done.

In the book, Lawson presents Mediu as lashing out in response to a different question "describing how Albanian officials were allegedly being paid kickbacks on AEY's contract, including Diveroli's recorded description of the Albanian 'Mafia' and the prime minister's son." Berisha argues that Lawson changed the timing of Mediu's outburst to imply that Mediu knew Diveroli's accusations about Berisha were true.

Berisha's insinuations about Lawson's depiction of this interview are misguided. Berisha does not dispute that Wood *did* interview Mediu about accusations of Albanian governmental involvement in the AEY scheme. And the record includes an email in which Wood told Lawson that, after the interview, Mediu threatened both the cameraman filming the interview and one of Wood's sources for the AEY allegations (Trebicka). Thus, even if Mediu's outburst was directly prompted by a question about his drug conviction, the record of this conversation supports Lawson's broader narrative that Mediu was angered by the interview and by Trebicka's accusations of an Albanian-government conspiracy with AEY. As Lawson testified in his deposition, "Nick Wood made it clear that [Mediu's outburst] was a cumulative thing but that it definitely included AEY. And the accusations about AEY were infuriating to him." Lawson further said that Wood reviewed that passage in the book and did not object to it.

24

Even if Lawson did somewhat misrepresent Mediu's outburst, this again is a relatively immaterial detail in the context of the book overall.  The overall effect of any change is minimal when it remains true that: (1) Wood confronted Mediu with accusations that Albanian officials were involved in the AEY scheme and (2) Mediu was upset by his interview with Wood, to the point that he threatened Wood's cameraman and a source for the AEY accusations.  Whether or not Lawson had included the additional detail of Wood discussing Mediu's unrelated drug conviction in the book, the "gist" remains the same: a reporter from the *New York Times* attempted to discuss the AEY matter with Mediu and in the end received only anger and threats as a result.

c

Finally, Berisha makes much of the fact that early drafts of Lawson's book included passages discussing various issues that arguably could not be verified.  In support, he cites an email from an editor at Simon & Schuster, who contended that Lawson's early manuscript focused too much on the Pentagon's supposed involvement in the AEY scheme, which she believed "put[] the book on shaky ground – both from a narrative stance and in terms of credibility (to take down the Pentagon you need armor-proof evidence)."  He also cites an email from C.J. Chivers, a writer from the *New York Times*, whom Lawson had contacted to clarify certain details that Lawson wanted to print regarding the supposed inferior quality

25

of the ammunition AEY provided (which were related to a photo that had been included in Chivers's reporting). In response, Chivers wrote angrily that Lawson's questions suggested that his book would misrepresent Chivers's reporting and indicated that Lawson had "written a factually unsupportable tale and hope[d] that it might stick."

But, in the final book, Lawson substantially cut back the Pentagon narrative, he independently researched and verified his claims related to the photo of the AEY ammunition, and—even more to the point—neither of these matters had anything do with Lawson's depiction of Berisha's involvement with AEY. Even if it were true that Lawson had at one point attempted to pursue unsupported details about unrelated matters, that would not show that he clearly harbored serious doubts about the well-sourced assertion of Berisha's connection to the AEY fraud.

In sum, none of Berisha's various attacks on other portions of Lawson's book can reasonably be viewed to undermine his reliance on a variety of sources to support the book's core claims about Berisha.[8]

---

[8] Because the evidence is insufficient to support a conclusion that Lawson himself acted with actual malice, Berisha's claims against the remaining defendants—Simon & Schuster, Recorded Books, Packouz, and Podrizki—fail as well. Though Berisha broadly asserts that Simon & Schuster "was aware of Lawson's . . . tendency to put his narrative before the facts," he does not identify evidence which could show "clearly and convincingly" this to be true. Indeed, the only evidence he identifies in support of such a claim is Lawson's early inclusion of the under-sourced Pentagon-conspiracy storyline, which *after feedback from Simon & Schuster*, Lawson largely removed from the book. Berisha has no evidence that anyone at Simon & Schuster actually harbored doubts—let alone *serious* doubts—about the accuracy of Lawson's depictions of Berisha, which again were corroborated by various sources.

III

Next, Berisha contends that the district court abused its discretion in denying his motion to compel production of certain communications between Lawson and Simon & Schuster's attorneys. *See Bogle v. McClure*, 332 F.3d 1347, 1358 (11th Cir. 2003). The district court found that the communications were protected from disclosure by, among other things, the attorney-client privilege. We consider whether, under New York law,[9] that is correct.

The attorney-client privilege protects from disclosure confidential communications between an attorney and his or her client made to solicit or to provide legal advice. *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 57 N.E.3d 30, 34 (N.Y. 2016). The communications at issue here concern Lawson's interaction with Simon & Schuster's lawyer, as the lawyer conducted a

---

Second, Berisha does not identify evidence to support his conclusory assertion that Packouz or Podrizki "fabricated Berisha's involvement with AEY" in order make money from Lawson. Regardless whether these two might have had such *motives* to lie, Berisha offers no evidentiary support for the notion that they indeed did lie.

Finally, Berisha acknowledges that there is no evidence on which to prove that Record Books acted with actual malice.

[9] Florida choice-of-law principles determine which forum's privilege law applies. *See Manuel v. Convergys Corp.*, 430 F.3d 1132, 1139 (11th Cir. 2005). In many areas, Florida follows "a flexible test to determine which state has the most significant relationships" to the matter, though in matters of contract Florida has rejected this in favor of a more traditional "lex loci" application of the law of the place of contracting. *See State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160, 1163–64 (Fla. 2006). Though it is not readily apparent what approach Florida courts would apply to resolve a conflict over the claim of privilege here, we need not decide that question, because (as the parties agree) New York law would likely apply under either approach given that the publishing contract was entered in New York, both Simon & Schuster and Lawson are New York residents, and the communications took place in New York.

27

pre-publication legal review of the contents of the book.  Berisha does not seriously dispute that, if Lawson were the lawyer's client—for example if he were a representative of Simon & Schuster—then the communications would be properly shielded.  *See, e.g.*, *Liberty Lobby*, 838 F.2d at 1302 ("Pre-publication discussions between libel counsel and editors or reporters would seem to come squarely within the scope of the privilege . . . .").  He argues, however, that because Lawson was merely a third-party contractor of the publishing house, his communications are not swept within the privilege.  Lawson responds that, at least for purposes of the legal pre-clearance review, he was, as a practical matter, effectively a Simon & Schuster employee, and is therefore covered by the privilege.

## A

The disagreement between the parties asks us to consider the "employee equivalent" doctrine—an extension of the Supreme Court's seminal decision in *Upjohn Co. v. United States*, 449 U.S. 383 (1981).  In *Upjohn*, the Supreme Court held that, where an attorney represents a corporation, the corporation's attorney-client privilege extends beyond individuals who "control" the corporation to include other employees with whom the lawyer must consult in order to advise the company.  *See id.* at 391–92.  New York courts have incorporated the *Upjohn* rule

into the state's own attorney-client privilege law.  *Cf. Niesig v. Team I*, 558 N.E.2d 1030, 1033–34 (N.Y. 1990) (discussing *Upjohn*).

Led by the Eighth Circuit, some courts have since held that the principles announced in *Upjohn* suggest that even a non-employee like a contractor or consultant may be covered by the attorney-client privilege where he or she acts as the *functional equivalent* of an employee for the relevant matter.  In *In re Bieter Co.*, 16 F.3d 929, 937 (8th Cir. 1994), the Eighth Circuit held that, for purposes of the *Upjohn* rule, "it is inappropriate to distinguish between those on the client's payroll and those who are instead, and for whatever reason, employed as independent contractors."  The court emphasized that the very point of *Upjohn* is to ensure that the lawyer may consult with knowledgeable employees to "know all that relates to the client's reasons for seeking representation [so that] the professional mission [can] be carried out."  *Id*. (quoting *Upjohn*, 449 U.S. at 389).  To this end, the court observed there "undoubtedly are situations . . . in which too narrow a definition of 'representative of the client' will lead attorneys not being able to confer confidentially with nonemployees who, due to their relationship to the client, possess the very sort of information that the privilege envisions flowing most freely."  *Id.* at 937–38.  Thus, in order to vindicate the concerns of *Upjohn*, the privilege must be afforded to certain "nonemployees who possess a significant relationship to the client and the client's involvement in the transaction that is the

29

subject of the legal services." *Id.* at 938 (alterations and internal quotation marks omitted).

Several courts—including courts in New York—have followed the Eighth Circuit's lead. *See, e.g.*, *United States v. Graf*, 610 F.3d 1148, 1158–59 (9th Cir. 2010) (adopting *Bieter* and collecting cases in lower courts doing the same); *Alliance Constr. Solutions, Inc. v. Dep't of Corrs.*, 54 P.3d 861, 869 (Colo. 2002) (adopting *Bieter* into Colorado law); *Frank v. Morgans Hotel Grp. Mgmt. LLC*, 116 N.Y.S.3d 889, 891–93 (N.Y. Sup. Ct. 2020) (applying *Bieter* under New York law); *Sieger v. Zak*, No. 19978/05, 2008 WL 598344, at *9 (N.Y. Sup. Ct. Feb. 21, 2008) (same); *Waste Admin. Servs., Inc. v. Krystal Co.*, No. E2017-01094-COA-R9-CV, 2018 WL 4673616, at *4–5 (Tenn. Ct. App. Sept. 27, 2018) (applying *Bieter* under Tennessee law). Indeed, Berisha does not seriously dispute that New York would embrace an "employee equivalent" extension of the *Upjohn* doctrine.

B

Berisha argues, however, that this doctrine is too narrow to apply in this case. In Berisha's telling, the doctrine applies only where an individual "looks, acts, and smells like a company employee," such as where the individual exercises authority on behalf of the company or falls within its chain of command. Because Lawson did not have "control over Simon & Schuster's decision to publish the [b]ook," Berisha argues that he was not, in any meaningful sense, the "equivalent"

30

of a Simon & Schuster employee. Berisha's argument essentially rests on the premise that, for purposes of New York's attorney-client privilege law, the scope of the "employee-equivalent" doctrine is to be understood similarly to the definition of an "employee" in the context of agency or employment law. *Cf. In re Vega*, 35 N.Y. 3d 131, 145–51 (2020) (Rivera, J., concurring) (discussing difference between employees and independent contractors under New York law).

Berisha's argument might seem reasonable on its face, and indeed, in some cases the employee-equivalent doctrine has been applied to individuals who have effectively "assumed the functions and duties of a full-time employee." *Frank*, 116 N.Y.S.3d at 892 (alterations and internal quotation marks omitted); *see also id.* (citing cases). However, Berisha's suggestion that the employee-equivalent doctrine must be limited *only* to such cases misconceives the purposes underlying the doctrine. As expressed in *Upjohn*, an overly restrictive view of the individuals who qualify as representatives of an attorney's corporate client threatens to frustrate the attorney's efforts to formulate sound legal advice based on information possessed by those directly involved in the matter. *See generally Upjohn*, 449 U.S. at 391–92. *Bieter* extended this logic with the recognition that "there undoubtedly are situations . . . [where even] nonemployees . . . , due to their relationship with the client, possess the very sort of information that the privilege envisions flowing most freely." *Bieter*, 16 F.3d at 938. *Bieter*'s core holding is

31

thus that the privilege must extend to cover "nonemployees who possess a significant relationship to the client and the client's involvement in the transaction that is the subject of legal services," and who therefore "have the relevant information needed by corporate counsel" to advise the client. *Id.* (internal quotation marks and alterations omitted). By its very nature, this includes individuals whom we might not—for other purposes in the law—consider to behave as "employees" of the corporation. *Cf. Alliance Constr. Solutions*, 54 P.3d at 869 ("[W]e agree with the *Bieter* court that a formal distinction between an employee and an independent contractor conflicts with the purposes supporting the privilege. An independent contractor with a meaningful relationship to the [corporation] may possess important information needed by the attorney to provide effective representation."). Thus, while factors like those referenced by Berisha are useful in evaluating the nonemployee's "relationship to the client," an absence of such factors does not necessarily destroy the application of the doctrine. *See generally Bieter*, 16 F.3d at 938.

## C

We are mindful that an overly broad employee-equivalent rule might threaten to sweep within the privilege conversations between a lawyer and various individuals who have not previously been considered to fall within the ambit of the privilege—for example mere third-party witnesses. Here, fortunately, we need not

32

probe the outer limits of the doctrine.  Regardless of his employment status, Lawson's "relationship" to Simon & Schuster and his "involvement in the transaction" that was the subject of the legal services—i.e., Simon & Schuster's legal review of the contents of the book *he wrote* for publication by the company— could hardly be more significant.  As the president of the Adult Publishing group at Simon & Schuster stated in an affidavit, because "the author is the sole proprietor of the sourcing and background information that went into the manuscript, the author's cooperation is essential to the pre-publication legal review process."  It would, in his words, "be impossible to conduct a meaningful pre-publication legal review without the author."

And, while their working relationship may not bear many of the hallmarks of a traditional employer-employee relationship, it is hardly the case (as Berisha is eager to suggest) that Lawson was utterly disconnected from Simon & Schuster— as if he were simply a witness or passerby to the company's activities.  If it were not apparent from the nature of the work itself, the publishing contract makes clear that Lawson and Simon & Schuster were indeed engaged in a *joint* effort to produce a published book to their mutual satisfaction and for their mutual benefit. Among other things, that contract specified that the company would pay Lawson an advance for his work toward producing a publishable book, laid out a process by which they would mutually attempt to work through editorial changes requested

33

by the company prior to publication, and detailed how the parties would split royalties and various rights to the continuing use and publication of the work after it was completed.

## D

For these reasons, some courts—including at least one applying New York law—have found individuals in nearly identical circumstances to Lawson to be covered by the attorney-client privilege. For example, in *Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1098 (S.D.N.Y. 1984), the court (applying New York law) found that the attorney-client privilege applied to conversations between lawyers for a movie studio and the author of the book that had served as the basis for a film's screenplay. Even though the author "was not a Universal employee and did not participate in the production of the film," the court found that "his participation in the [legal preclearance] meeting was functionally equivalent to that of an author of a magazine or newspaper article who submits his work to in-house counsel for prepublication libel review and should thus come within the rule of *Upjohn*." *Id.* The same should be said for Lawson here.

More recently, in another case out of the Southern District of New York, the court found that the privilege applied to conversations between a movie studio's attorney and the film's director and script writer, both of whom were independent contractors. *See Twentieth Century Fox Film Corp. v. Marvel Enters.*, No. 01 Civ.

34

3016, 2002 WL 31556383 (S.D.N.Y. Nov. 15, 2002).  The court explained that,

given their roles in making the movie, the director and writer were "the functional

equivalent of employees" of the studio that would produce it.  *Id.* at \*2.  In a

passage that could easily describe the book industry, the court elaborated:

> Fox's determination to conduct its business through the use of
> independent contractors is a result of the sporadic nature of
> employment in the motion picture industry; for a wide variety of
> reasons, producers, directors and actors generally do not 'turn out'
> movies with the same mechanical regularity with which most tangible
> products are produced.  The fact that the nature of the industry dictates
> the use of independent contractors over employees should not, without
> more, create greater limitations on the scope of the attorney-client
> privilege.

*Id.*  At least one court outside of New York has reached a similar conclusion.  *See,*

*e.g.*, *Tyne v. Time Warner Entm't Co.*, 212 F.R.D. 596, 600–01 (M.D. Fla. 2002)

(disclosure of in-house legal advice from one movie studio to another involved in

the joint production of a film did not waive attorney client privilege).  And Berisha

has not cited a single case in which a court disagreed that the employee-equivalent

doctrine would apply in circumstances like these.

   For the reasons elaborated above, we agree that the employee-equivalent

doctrine would likely shield from discovery the communications at issue here.  The

district court did not abuse its discretion in denying Berisha's motion to compel.[10]

---

[10] Because we conclude that the communications were protected under the attorney-client
privilege, we do not consider the defendants' assertions of other privileges.

IV

Finally, Berisha briefly asserts that "summary judgment was premature" because the district court denied his July 17, 2018, motion to extend further discovery so that he could depose four of Lawson's foreign sources.  Berisha suggests that he would have liked this additional evidence but does not explain why exactly it would be critical to this case.  More importantly, he presents no argument as to how the district court's failure to extend discovery for a third time was legally erroneous.  At that point (only two weeks before discovery was set to end) Berisha had been given substantial opportunity to initiate such discovery, the district had twice extended the discovery deadline, and the court had explicitly allowed him "to conduct discovery beyond the discovery deadline," if he so chose.  Yet, Berisha did not bother to take even the first step in securing these depositions (filing the requisite letters of issue) until June 27, 2018—even though he supposedly had known he wanted to take those depositions for months.

In short, Berisha presents no grounds upon which we could conclude that the district court abused its discretion in denying him an additional and last-minute extension of the discovery deadline.  *See, e.g.*, *Quiet Tech. DC-8, Inc. v. Hurel-*

---

Likewise, because the district court did not err in finding the communications to be privileged (and thus protected from production), we do not consider Berisha's argument that it was premature to grant summary judgment without allowing additional time for these materials to be produced.

36

*Dubois UK Ltd.*, 326 F.3d 1333, 1351–52 (11th Cir. 2003) (no abuse of discretion

where district court denied a third extension of the discovery deadline).

V

The judgment of the district court is **AFFIRMED**.