7/16/2021 9:36:48 AM

# Compare Results

| Old File: | | New File: |
|---|---|---|
| **20-1063.pdf** | versus | **20-1063_new.pdf** |
| **11 pages (118 KB)** | | **11 pages (157 KB)** |
| 7/1/2021 3:57:42 PM | | 7/16/2021 9:35:40 AM |

**Total Changes**

1

**Content**

1  Replacement

0  Insertions

0  Deletions

**Styling and Annotations**

0  Styling

0  Annotations

Go to First Change (page 6)

# SUPREME COURT OF THE UNITED STATES

SHKELZEN BERISHA *v.* GUY LAWSON, ET AL.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 20–1063.   Decided July 2, 2021

The petition for a writ of certiorari is denied.

JUSTICE THOMAS, dissenting from the denial of certiorari.

In 2015, Guy Lawson published a book detailing the "true story" of how three Miami youngsters became international arms dealers. 973 F. 3d 1304, 1306 (CA11 2020). A central plot point involves the protagonists' travels to Albania and subsequent run-ins with the "Albanian mafia," a key figure of which, the book claims, is petitioner Shkelzen Berisha. The book performed well, and Lawson eventually sold the movie rights to Warner Bros., which made the feature film War Dogs.

Unhappy with his portrayal, Berisha sued Lawson for defamation under Florida law. According to Berisha, he is not associated with the Albanian mafia—or any dangerous group—and Lawson recklessly relied on flimsy sources to contend that he was.

The District Court granted summary judgment in favor of Lawson. Setting aside questions of truth or falsity, the court simply asked whether Berisha is a "public figure." Why? Because under this Court's First Amendment jurisprudence, public figures cannot establish libel without proving by clear and convincing evidence that the defendant acted with "'actual malice'"—that is with knowledge that the published material "was false or with reckless disregard of whether it was false." *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 280 (1964); accord, *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 334–335, 342 (1974); *Curtis Pub-*

*lishing Co.* v. *Butts*, 388 U. S. 130, 155 (1967). After con-
cluding that Berisha is a public figure (or at least is one for
purposes of Albanian weapons-trafficking stories), the court
found that he had not satisfied this high standard. The
Eleventh Circuit affirmed.

Berisha now asks this Court to reconsider the "actual
malice" requirement as it applies to public figures. As I ex-
plained recently, we should. See *McKee* v. *Cosby*, 586 U. S.
___, ___ (2019) (opinion concurring in denial of certiorari)
(slip op., at 2).

This Court's pronouncement that the First Amendment
requires public figures to establish actual malice bears "no
relation to the text, history, or structure of the Constitu-
tion." *Tah* v. *Global Witness Publishing, Inc.*, 991 F. 3d 231,
251 (CADC 2021) (Silberman, J., dissenting) (emphasis de-
leted). In fact, the opposite rule historically prevailed:
"[T]he common law deemed libels against public figures to
be . . . *more* serious and injurious than ordinary libels."
*McKee*, 586 U. S., at ___ (opinion of THOMAS, J.) (slip op., at
7).

The Court provided scant explanation for the decision to
erect a new hurdle for public-figure plaintiffs so long after
the First Amendment's ratification. In *Gertz*, for example,
the Court reasoned that public figures are fair targets be-
cause "they invite attention and comment." 418 U. S., at
345. That is, "public officials and public figures have vol-
untarily exposed themselves to increased risk of injury from
defamatory falsehood." *Ibid.* But it is unclear why expos-
ing oneself to an increased risk of becoming a victim neces-
sarily means forfeiting the remedies legislatures put in
place for such victims. And, even assuming that it is some-
times fair to blame the victim, it is less clear why the rule
still applies when the public figure "has not voluntarily
sought attention." 378 F. Supp. 3d 1145, 1158 (SD Fla.
2018); see also *Rosanova* v. *Playboy Enterprises, Inc.*, 580
F. 2d 859, 861 (CA5 1978) ("It is no answer to the assertion

that one is a public figure to say, truthfully, that one doesn't choose to be").

The lack of historical support for this Court's actual-malice requirement is reason enough to take a second look at the Court's doctrine. Our reconsideration is all the more needed because of the doctrine's real-world effects. Public figure or private, lies impose real harm. Take, for instance, the shooting at a pizza shop rumored to be "the home of a Satanic child sex abuse ring involving top Democrats such as Hillary Clinton," Kennedy, 'Pizzagate' Gunman Sentenced to 4 Years in Prison, NPR (June 22, 2017), www.npr.org/section/thetwo-way/2017/06/22/533941689/pizzagate-gunman-sentenced-to-4-years-in-prison. Or consider how online posts falsely labeling someone as "a thief, a fraudster, and a pedophile" can spark the need to set up a home-security system. Hill, A Vast Web of Vengeance, N. Y. Times (Jan. 30, 2021), www.nytimes.com/2021/01/30/technology/change-my-google-results.html. Or think of those who have had job opportunities withdrawn over false accusations of racism or anti-Semitism. See, *e.g.,* Wemple, Bloomberg Law Tried To Suppress Its Erroneous Labor Dept. Story, Washington Post (Sept. 6, 2019), www.washingtonpost.com/opinions/2019/09/06/bloomberg-law-tried-suppress-its-erroneous-labor-dept-story. Or read about Kathrine McKee—surely this Court should not remove a woman's right to defend her reputation in court simply because she accuses a powerful man of rape. See *McKee*, 586 U. S., at \_\_\_–\_\_\_ (opinion of THOMAS, J.) (slip op., at 1–2).

The proliferation of falsehoods is, and always has been, a serious matter. Instead of continuing to insulate those who perpetrate lies from traditional remedies like libel suits, we should give them only the protection the First Amendment requires. I would grant certiorari.

# SUPREME COURT OF THE UNITED STATES

## SHKELZEN BERISHA *v.* GUY LAWSON, ET AL.

### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 20–1063.    Decided July 2, 2021

JUSTICE GORSUCH, dissenting from the denial of certiorari.

The Bill of Rights protects the freedom of the press not as a favor to a particular industry, but because democracy cannot function without the free exchange of ideas. To govern themselves wisely, the framers knew, people must be able to speak and write, question old assumptions, and offer new insights. "If a nation expects to be ignorant and free . . . it expects what never was and never will be. . . . There is no safe deposit for [liberty] but with the people . . . [w]here the press is free, and every man able to read." Letter from T. Jefferson to C. Yancey (Jan. 6, 1816), in 10 The Writings of Thomas Jefferson 4 (P. Ford ed. 1899).

Like most rights, this one comes with corresponding duties. The right to due process in court entails the duty to abide the results that process produces. The right to speak freely includes the duty to allow others to have their say. From the outset, the right to publish was no different. At the founding, the freedom of the press generally meant the government could not impose prior restraints preventing individuals from publishing what they wished. But none of that meant publishers could defame people, ruining careers or lives, without consequence. Rather, those exercising the freedom of the press had a responsibility to try to get the facts right—or, like anyone else, answer in tort for the injuries they caused.

This principle extended far back in the common law and far forward into our Nation's history. As Blackstone put it,

"[e]very freeman has an undoubted right to lay what senti-
ments he pleases before the public," but if he publishes
falsehoods "he must take the consequence of his own temer-
ity."  4 W. Blackstone, Commentaries on the Laws of Eng-
land 151–152 (1769).  Or as Justice Story later explained,
"the liberty of the press do[es] not authorize malicious and
injurious defamation."  *Dexter* v. *Spear*, 7 F. Cas. 624 (No.
3,867) (CC RI 1825).

This was "[t]he accepted view" in this Nation for more
than two centuries.  *Herbert* v. *Lando*, 441 U. S. 153, 158–
159, and n. 4 (1979).  Accordingly, "from the very founding"
the law of defamation was "almost exclusively the business
of state courts and legislatures."  *Gertz* v. *Robert Welch,
Inc.*, 418 U. S. 323, 369–370 (1974) (White, J., dissenting).
As a rule, that meant all persons could recover damages for
injuries caused by false publications about them.  See Kur-
land, The Original Understanding of the Freedom of the
Press Provision of the First Amendment, 55 Miss. L. J. 225,
234–237 (1985); J. Baker, An Introduction to English Legal
History 474–475 (5th ed. 2019); Epstein, Was *New York
Times* v. *Sullivan* Wrong? 53 U. Chi. L. Rev. 782, 801–802
(1986); *Peck* v. *Tribune Co.*, 214 U. S. 185, 189 (1909).

This changed only in 1964.  In *New York Times Co.* v.
*Sullivan*, 376 U. S. 254 (1964), this Court declared that
public officials could no longer recover for defamation as
everyone had for centuries.  Now, public officials could pre-
vail only by showing that an injurious falsehood was pub-
lished with "'actual malice.'"  *Id.,* at 279–280.  Three years
later, the Court extended its actual malice standard from
"public officials" in government to "public figures" outside
government.  See generally *Curtis Publishing Co.* v. *Butts*,
388 U. S. 130 (1967).  Later still, the Court cast the net even
wider, applying its new standard to those who have
achieved "pervasive fame or notoriety" and those "limited"
public figures who "voluntarily injec[t]" themselves or are
"drawn into a particular public controversy."  *Gertz*, 418

U. S., at 351. The Court viewed these innovations "over-turning 200 years of libel law" as "necessary to implement the First Amendment interest in 'uninhibited, robust, and wide-open' debate on public issues." *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.*, 472 U. S. 749, 766 (1985) (White, J., concurring in judgment).

Since 1964, however, our Nation's media landscape has shifted in ways few could have foreseen. Back then, building printing presses and amassing newspaper distribution networks demanded significant investment and expertise. See Logan, Rescuing Our Democracy by Rethinking *New York Times Co.* v. *Sullivan*, 81 Ohio St. L. J. 759, 794 (2020) (Logan). Broadcasting required licenses for limited airwaves and access to highly specialized equipment. See *ibid.* Comparatively large companies dominated the press, often employing legions of investigative reporters, editors, and fact-checkers. See *id.,* at 794–795. But "[t]he liberty of the press" has never been "confined to newspapers and periodicals"; it has always "comprehend[ed] every sort of publication which affords a vehicle of information and opinion." *Lovell* v. *City of Griffin*, 303 U. S. 444, 452 (1938); see also Sentelle, Freedom of the Press: A Liberty for All or a Privilege for a Few? 2013 Cato S. Ct. Rev. 15, 30–34. And thanks to revolutions in technology, today virtually anyone in this country can publish virtually anything for immediate consumption virtually anywhere in the world. Logan 803 (noting there are 4 billion active social media users worldwide).

The effect of these technological changes on our Nation's media may be hard to overstate. Large numbers of newspapers and periodicals have failed. See Grieco, Pew Research Center, Fast Facts About the Newspaper Industry's Financial Struggles as McClatchy Files for Bankruptcy (Feb. 14, 2020), http://www.pewresearch.org/fact -tank/2020/02/14/fast-facts-about-the-newspaper-industrys -financial-struggles/. Network news has lost most of its viewers. Pew Research Center, Network Evening News

Ratings (Mar. 13, 2006), https://www.journalism.org/
numbers/network-evening-news-ratings/. With their fall
has come the rise of 24-hour cable news and online media
platforms that "monetize anything that garners clicks." Lo-
gan 800. No doubt, this new media world has many vir-
tues—not least the access it affords those who seek infor-
mation about and the opportunity to debate public affairs.
At the same time, some reports suggest that our new media
environment also facilitates the spread of disinformation.
*Id.*, at 804. A study of one social network reportedly found
that "falsehood and rumor dominated truth by every metric,
reaching more people, penetrating deeper . . . and doing so
more quickly than accurate statements." *Id.,* at 804, n. 302;
see Vosoughi, Roy, & Aral, The Spread of True and False
News Online, Science Magazine, Mar. 9, 2018, pp. 1146–
1151. All of which means that "the distribution of disinfor-
mation"—which "costs almost nothing to generate"—has
become a "profitable" business while "the economic model
that supported reporters, fact-checking, and editorial over-
sight" has "deeply erod[ed]." Logan 800.

It's hard not to wonder what these changes mean for the
law. In 1964, the Court may have seen the actual malice
standard as necessary "to ensure that dissenting or critical
voices are not crowded out of public debate." Brief in Oppo-
sition 22. But if that justification had force in a world with
comparatively few platforms for speech, it's less obvious
what force it has in a world in which everyone carries a
soapbox in their hands. Surely, too, the Court in 1964 may
have thought the actual malice standard justified in part
because other safeguards existed to deter the dissemination
of defamatory falsehoods and misinformation. Logan 794–
795. In that era, many major media outlets employed fact-
checkers and editors, *id.,* at 795, and one could argue that
most strived to report true stories because, as "the public
gain[ed] greater confidence that what they read [wa]s true,"
they would be willing to "pay more for the information so

provided," Epstein, 53 U. Chi. L. Rev., at 812. Less clear is what sway these justifications hold in a new era where the old economic model that supported reporters, fact-checking, and editorial oversight is disappearing.

These questions lead to other even more fundamental ones. When the Court originally adopted the actual malice standard, it took the view that tolerating the publication of *some* false information was a necessary and acceptable cost to pay to ensure truthful statements vital to democratic self-government were not inadvertently suppressed. See *Sullivan*, 376 U. S., at 270–272. But over time the actual malice standard has evolved from a high bar to recovery into an effective immunity from liability. Statistics show that the number of defamation trials involving publications has declined dramatically over the past few decades: In the 1980s there were on average 27 per year; in 2018 there were 3. Logan 808–810 (surveying data from the Media Law Resource Center). For those rare plaintiffs able to secure a favorable jury verdict, nearly one out of five today will have their awards eliminated in post-trial motions practice. *Id.,* at 809. And any verdict that manages to make it past all that is still likely to be reversed on appeal. Perhaps in part because this Court's jurisprudence has been understood to invite appellate courts to engage in the unusual practice of revisiting a jury's factual determinations *de novo*, it appears just 1 of every 10 jury awards now survives appeal. *Id.,* at 809–810.

The bottom line? It seems that publishing *without* investigation, fact-checking, or editing has become the optimal legal strategy. See *id.,* at 778–779. Under the actual malice regime as it has evolved, "ignorance is bliss." *Id.*, at 778. Combine this legal incentive with the business incentives fostered by our new media world and the deck seems stacked against those with traditional (and expensive) journalistic standards—and in favor of those who can dissemi-

nate the most sensational information as efficiently as possible without any particular concern for truth.  See *ibid.* What started in 1964 with a decision to tolerate the occasional falsehood to ensure robust reporting by a comparative handful of print and broadcast outlets has evolved into an ironclad subsidy for the publication of falsehoods by means and on a scale previously unimaginable.  *Id.*, at 804. As *Sullivan*'s actual malice standard has come to apply in our new world, it's hard not to ask whether it now even "cut[s] against the very values underlying the decision." Kagan, A Libel Story: *Sullivan* Then and Now, 18 L. & Soc. Inquiry 197, 207 (1993) (reviewing A. Lewis, Make No Law: The *Sullivan* Case and the First Amendment (1991)).  If ensuring an informed democratic debate is the goal, how well do we serve that interest with rules that no longer merely tolerate but encourage falsehoods in quantities no one could have envisioned almost 60 years ago?

Other developments raise still more questions.  In 1964, the Court may have thought the actual malice standard would apply only to a small number of prominent governmental officials whose names were always in the news and whose actions involved the administration of public affairs. Here again, the Court may have thought that allowing some falsehoods about these persons and topics was an acceptable price to pay to ensure truthful statements vital to democratic self-government were not inadvertently suppressed.  Perhaps the Court weighed the costs and benefits similarly when it extended the actual malice standard to the "pervasively famous" and "limited purpose public figures."

But today's world casts a new light on these judgments as well.  Now, private citizens can become "public figures" on social media overnight.  Individuals can be deemed "famous" because of their notoriety in certain channels of our now-highly segmented media even as they remain unknown in most.  See, *e.g., Hibdon* v. *Grabowski*, 195 S. W.

3d 48, 59, 62 (Tenn. App. 2005) (holding that an individual was a limited-purpose public figure in part because he "entered into the jet ski business and voluntarily advertised on the news group *rec.sport.jetski*, an Internet site that is accessible worldwide"). Lower courts have even said that an individual can become a limited purpose public figure simply by *defending* himself from a defamatory statement. See *Berisha* v. *Lawson*, 973 F. 3d 1304, 1311 (CA11 2020). Other persons, such as victims of sexual assault seeking to confront their assailants, might choose to enter the public square only reluctantly and yet wind up treated as limited purpose public figures too. See *McKee* v. *Cosby*, 586 U. S. ___, ___ (2019) (THOMAS, J., concurring in denial of certiorari) (slip op., at 1). In many ways, it seems we have arrived in a world that dissenters proposed but majorities rejected in the *Sullivan* line of cases—one in which, "voluntarily or not, we are all public [figures] to some degree." *Gertz*, 418 U. S., at 364 (Brennan, J., dissenting) (brackets and internal quotation marks omitted).

Again, it's unclear how well these modern developments serve *Sullivan*'s original purposes. Not only has the doctrine evolved into a subsidy for published falsehoods on a scale no one could have foreseen, it has come to leave far more people without redress than anyone could have predicted. And the very categories and tests this Court invented and instructed lower courts to use in this area—"pervasively famous," "limited purpose public figure"—seem increasingly malleable and even archaic when almost anyone can attract some degree of public notoriety in some media segment. Rules intended to ensure a robust debate over actions taken by high public officials carrying out the public's business increasingly seem to leave even ordinary Americans without recourse for grievous defamation. At least as they are applied today, it's far from obvious whether *Sullivan*'s rules do more to encourage people of

goodwill to engage in democratic self-governance or discourage them from risking even the slightest step toward public life.

"In a country like ours, where the people . . . govern themselves through their elected representatives, adequate information about their government is of transcendent importance." *Dun & Bradstreet*, 472 U. S., at 767 (White, J., concurring in judgment). Without doubt, *Sullivan* sought to promote that goal as the Court saw the world in 1964. Departures from the Constitution's original public meaning are usually the product of good intentions. But less clear is how well *Sullivan* and all its various extensions serve its intended goals in today's changed world. Many Members of this Court have raised questions about various aspects of *Sullivan*. See, *e.g., McKee*, 586 U. S., at ___ (opinion of THOMAS, J.); *Coughlin* v. *Westinghouse Broadcasting & Cable, Inc.*, 476 U. S. 1187 (1986) (Burger, C. J., joined by Rehnquist, J., dissenting from denial of certiorari); *Gertz*, 418 U. S., at 370 (White, J., dissenting); *Rosenbloom* v. *Metromedia, Inc.*, 403 U. S. 29, 62 (1971) (Harlan, J., dissenting); *id.*, at 78 (Marshall, J., dissenting); *Rosenblatt* v. *Baer*, 383 U. S. 75, 92–93 (1966) (Stewart, J., concurring); see also Kagan, 18 L. & Soc. Inquiry*,* at 205, 209; Lewis & Ottley, *New York Times* v. *Sullivan* at 50, 64 De Paul L. Rev. 1, 35–36 (2014) (collecting statements from Justice Scalia). JUSTICE THOMAS does so again today. In adding my voice to theirs, I do not profess any sure answers. I am not even certain of all the questions we should be asking. But given the momentous changes in the Nation's media landscape since 1964, I cannot help but think the Court would profit from returning its attention, whether in this case or another, to a field so vital to the "safe deposit" of our liberties.