[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-11299

_____

PENNY PHELPS,

Plaintiff-Appellant,

*versus*

SHERIFF RICK RAMSAY,
in his official and individual capacities,
CARA HIGGINS,
LAUREN JENAI,
FRANKLIN TUCKER,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 4:21-cv-10070-JEM

————————————

Before JILL PRYOR, BRANCH, and HULL, Circuit Judges.

PER CURIAM:

This appeal involves a dispute over Penny Phelps's termination from the Monroe County Sheriff's Office. Phelps sued Sheriff Rick Ramsay, Cara Higgins, Lauren Jenai, and Franklin Tucker alleging various claims arising from defendants' purported involvement in her termination. Phelps's nine-count complaint included claims for employment discrimination under 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964, violations of the Florida Law Enforcement Officers' Bill of Rights, defamation, tortious interference with a business relationship, and civil conspiracy. The district court dismissed some of Phelps's claims and later granted summary judgment as to the others. After review and with the benefit of oral argument, we find no reversible error in the district court's rulings.

## I.    BACKGROUND

Plaintiff Penny Phelps was a Captain in the Monroe County Sheriff's Office ("MCSO") overseeing the Major Crimes Unit. During the events giving rise to this action, Phelps was overseeing the investigation of the murder of Matthew Bonnett. Defendant Sheriff Rick Ramsay terminated Phelps's employment for

misconduct during that investigation. Defendant Franklin Tucker ultimately was charged with Bonnett's murder; Defendant Cara Higgins was Tucker's criminal defense attorney at that time; and Defendant Lauren Jenai is Defendant Tucker's former girlfriend, now wife. We review Phelps's conduct that ultimately led to her termination. We also review the conduct of Defendants Tucker, Higgins, and Jenai that underlies Phelps's defamation, tortious interference, and civil conspiracy claims.

We briefly recount the facts of this case in the light most favorable to Phelps.

## A.    Treehouse Murder Investigation

Phelps began working as a Captain for the MCSO on February 26, 2002. After Sheriff Ramsay's election in 2012, Phelps received additional responsibilities and duties, and by 2017 Phelps was responsible for, among other things, the Major Crimes Unit.

On November 17, 2017, Matthew Bonnett was murdered. Bonnett's murder became known in the community as the "Treehouse Murder." Phelps, along with other officers, investigated the Treehouse Murder.

On November 20, 2017, Phelps met with subordinate officers in the MCSO criminal investigation office to discuss investigative strategy. During this meeting, the officers discussed a plan to obtain the identification of a suspect in Bonnett's murder—a black man known to the officers only as "Detroit"—without alerting him to the fact that he was a suspect in a murder

case.  To this end, Phelps called Deputy Lee Malone to request assistance with a ruse.

Phelps proposed to Malone that he act like a "white supremacist" or "neo-Nazi that's picking on [a] black guy" and conduct a legal traffic stop to obtain "Detroit's" thumbprint:

> My grumpy old man . . . can I use you again today? . . . .

> What I want you to do is be a marked unit in that area and when Detroit gets on his bike and wheels away from there, I want you to make a legitimate traffic stop—for riding on the wrong side of the road or wa[i]ving through a stop sign and I want you to write him a ticket so I can get his thumbprint.

> . . . .

> Just do this . . . hang out, make a traffic stop. If you do have a legitimate traffic stop, we'll have a road patrol deputy come over and meet you and you can write a ticket with road patrol deputy.

> I just need somebody that can be in the area, Lee, and not leave, because I don't know when he's going to move or if he's going to move . . . because we don't want Detroit knowing that we know who the hell he is we want it to look like you the grumpy old man.  You have nothing better to do than . . . . you know, you're the white supremacist you're messing with the black guy riding a bike . . . .

> . . . .

23-11299                 Opinion of the Court                    5

> . . . I just want you to be the neo-Nazi that's picking on the black guy riding the bike . . . Get me a citizen's complaint . . . give me a citizen's complaint if you have to . . . .

Phelps's side of the conversation was surreptitiously recorded. Unbeknownst to the officers, the recording equipment in the interview room adjacent to the criminal investigation office had not been turned off and picked up statements that were made in the office.

Despite this conversation, Malone never used the ruse to stop "Detroit." Instead, later, Phelps and other officers learned "Detroit" was Rory Wilson.

Later, Wilson, Tucker (a defendant here), and John Travis Johnson were arrested, and all three were charged with robbery and felony murder. *See Florida v. Johnson*, Case No. 2017-CF-841-A-K (Fla. Cir. Ct.); *Florida v. Wilson*, Case No. 2017-CF-841-B-K (Fla. Cir. Ct.); *Florida v. Tucker*, Case No. 2017-CF-841-C-K (Fla. Cir. Ct.).

## B.    Tucker's Criminal Case

In January 2019, Tucker retained Cara Higgins, an attorney, to represent him in his criminal case. Because Phelps has sued Higgins here, we review Higgins's involvement.

During discovery in Tucker's criminal case, sometime between February 2019 and August 2019, the surreptitious recording of Phelps's conversation with Malone was produced to Higgins.

6                    Opinion of the Court                    23-11299

On October 3, 2019, there was a public pre-trial hearing related to Tucker's criminal case. Phelps and approximately 20 other deputies attended the hearing, based on a miscommunication and not knowing that the hearing was merely a status conference and that no testimony would be given.

Attorney Higgins complained to the MCSO regarding the presence of the deputies in the courtroom. On October 4, 2019, Phelps received a notice of an internal affairs investigation into Higgins's complaint about the hearing. Attached to the notice was a memo that informed Phelps that, in light of the internal affairs investigation, supervision of the Treehouse Murder cases was being transferred to Major Chad Scibilia in order to avoid any appearance of impropriety. On October 11, 2019, Patrick McCullah, General Counsel of the MCSO, sent attorney Higgins a copy of the memo that was attached to Phelps's notice of investigation. On October 19, 2019, Higgins attached the memo to a filing in Tucker's criminal case.

Attorney Higgins also complained about other purported misconduct associated with records requests Higgins submitted to the MCSO pertaining to the investigation of the Treehouse Murder. On October 15, 2019, Higgins emailed McCullah and complained that (1) she had not received records yet and (2) the MCSO was allowing its employees to view and redact public records before they were produced. On October 22, 2019, Higgins sent another email to McCullah and others, accusing Phelps of personal acts of aggression for directing Brittany Brown to notify

the State Attorney's Office anytime Higgins makes a public records request.

### C.    "Project Mayhem"

In the instant case, Phelps asserts that in the summer of 2019, Tucker and his then-girlfriend, Jenai, discussed a plan to file internal affairs complaints against Phelps to discredit her and have her removed from the Treehouse Murder investigation. Tucker and Jenai named this plan "Project Mayhem." Jenai testified that Project Mayhem was a nickname for her and Tucker's efforts to expose public corruption.

On September 15, 2019, Tucker sent a letter to the MCSO Internal Affairs Division, accusing Phelps and others of engaging "in a broad spectrum of misconduct." On October 23, 2019, Inspector General Lee Ann Holroyd and Inspector Donny Barrios interviewed Tucker at the detention center to discuss his complaints regarding the Treehouse Murder investigation. During the interview, Tucker provided the MCSO with sworn testimony regarding his allegations of misconduct.

Phelps was served with two notices of investigation on November 14, 2019. The first, which listed Higgins as the complainant, pertained to "[e]vents and circumstances surrounding the investigation and management" of the Treehouse Murder that occurred on or about November 27, 2017. The second, which listed Tucker and Higgins as the complainants, pertained to "[t]he facts and circumstances surrounding comments and directives, including instructions to 'be the neo-Nazi that's

picking on the black guy riding a bike' provided to . . . Malone on November 20, 2017 during a meeting captured on video/audio during the investigation" of the Treehouse Murder.

### D.    Social Media and Media Statements

In late 2019, media outlets began reporting on alleged misconduct that occurred during the Treehouse Murder investigation and prosecution. Some of those articles discussed the recorded statements Phelps made on November 20, 2017. Ramsay, Higgins, Tucker, and Jenai addressed the misconduct allegations in the media and on social media. Among other things, Tucker asserted that Phelps (1) instructed Officer Malone to make an "illegal" traffic stop and (2) framed him for murder.

The Washington Post ran an article on December 10, 2019, titled "Deputy told to act like a 'white supremacist' when stopping black murder suspect." The article stated that Ronnie Dunn, a professor at Cleveland State University, "said it's not clear from the details available whether Malone could have violated the suspect's civil rights in following his superior's directions . . . [but] the actions were 'probably legal.'"

On December 11, 2019, Tucker posted on Facebook "My only real criticism is of the expert who says her actions were 'probably legal'. While the acting like a racist may be legal, telling the officer to pull him over for some imagined infraction, is not. Once again, this is the least of what Captain Phelps did wrong in this case but hopefully this topic will shed light on her many other acts of misconduct, namely framing me for murder."

### E.    Phelps's Termination

On November 19, 2019, Scibilia and Colonel Lou Caputo met with Phelps, and Scibilia informed her that he was going to recommend that she be removed from command of the Special Investigation Division, including the Major Crimes and Narcotics units.  On December 4, Phelps received a memo stating that the command of the Major Crimes and Narcotics units was being transferred to Patty Thompson.

On December 13, 2019, Inspector General Holroyd sent Major Scibilia a memo, attaching the completed Internal Affairs investigation into Phelps for Scibilia's initial finding and recommended action.  After reviewing the investigation, Scibilia sent Sheriff Ramsay, via chain of command, a memo on December 13, 2019, strongly recommending Phelps's termination.  Scibilia concluded that Phelps's statements were unacceptable and had "eroded the public trust in her and this agency and made her ineffective and unwelcome with our community partners and members."  After reviewing Scibilia's memo, Colonel Caputo sent Ramsay a memo on December 13, 2019.  Caputo determined that Phelps's "comments have damaged the agency's ability to effectively fulfill [its] mission" and therefore, agreed with Scibilia's recommendation to terminate Phelps.

The next day, December 14, 2019, Phelps received a notice from Sheriff Ramsay that he intended to terminate her employment.  Ramsay's letter noted that he reviewed both the investigation and recommendations from Scibilia and Caputo.

Based on his review, Ramsay decided to withdraw Phelps's appointment. Ramsay noted that before making a final decision, Phelps would have the opportunity to provide any information relevant to her termination and could request a pre-determination hearing "to refute or explain the reasons given" for her dismissal.

Phelps had her pre-determination hearing with Ramsay, Caputo, and Scibilia on December 19, 2019. During her pre-determination hearing, Phelps defended her instructions to Malone. After her pre-termination meeting, Phelps was terminated on December 19, 2019.

## II.    DISCUSSION

On appeal, Phelps argues that the district court erred by (1) dismissing her Florida Law Enforcement Officers' Bill of Rights claim against Sheriff Ramsay and attorney Higgins, (2) dismissing her defamation claim against Sheriff Ramsay, (3) dismissing her tortious interference with a business relationship claim against Higgins, Jenai, and Tucker (the "Individual Defendants"), (4) granting summary judgment for Sheriff Ramsay on her Title VII claim, (5) granting summary judgment for Sheriff Ramsay on her § 1983 claim, (6) granting summary judgment for the Individual Defendants on her defamation claims, and (7) granting summary judgment for the Individual Defendants on her civil conspiracy claim.

We review *de novo* a dismissal for failure to state a claim. *Hoever v. Marks*, 993 F.3d 1353, 1357 (11th Cir. 2021) (en banc). And we "may affirm on any ground supported by the record, regardless

of whether that ground was relied upon or even considered below." *PDVSA US Litig. Tr. v. LukOil Pan Ams. LLC*, 65 F.4th 556, 562 (11th Cir. 2023) (quotation marks omitted). Ordinarily, we review *de novo* a district court's decision as to summary judgment, "drawing all inferences in the light most favorable to the non-moving party[.]" *Smith v. Owens*, 848 F.3d 975, 978 (11th Cir. 2017). "[S]ummary judgment is appropriate only where there are no genuine issues of material fact." *Id.*

After review, we conclude that Phelps's arguments on appeal lack merit and warrant no further discussion except for three issues: (1) whether Phelps can bring a private action for money damages for alleged violations of the Florida Law Enforcement Officers' Bill of Rights ("FLEOBOR"); (2) whether a jury issue exists as to malice on Phelps's defamation claims against the Individual Defendants; and (3) whether the Individual Defendants are entitled to privilege on Phelps's tortious interference with a business relationship claim.

## A.     Florida Law Enforcement Officers' Bill of Rights

The operative complaint in this case is Phelps's amended complaint filed on August 20, 2021, which we refer to as the complaint. Phelps brought a claim against Sheriff Ramsay and attorney Higgins for alleged violations of the FLEOBOR, seeking money damages. This FLEOBOR section proceeds in three parts. First, we review the relevant provisions of the FLEOBOR, including the remedy for FLEOBOR violations. Second, we outline the specific allegations contained in Phelps's FLEOBOR

claim.   Third, we address Phelps's arguments regarding the dismissal of her FLEOBOR claim.

The FLEOBOR is codified in § 112.531 through § 112.536 and found in Part VI of Chapter 112 of Title X of the Florida Statutes.   The FLEOBOR, among other things, affords law enforcement officers various rights and protections while they are under investigation by their agency.  *See* Fla. Stat. § 112.532(1).  It also prescribes procedures for receiving and investigating complaints against officers and for making a final determination, including provisions protecting the confidentiality of the proceedings.  *See* Fla. Stat. § 112.533.

Importantly for this appeal, the FLEOBOR also sets forth procedures that apply when a law enforcement agency fails to comply with the FLEOBOR's statutory requirements while investigating an officer.  *See* Fla. Stat. § 112.534(1).  Under those procedures, if the officer gives notice of the FLEOBOR violation and it is not remedied, the officer may request a hearing before a compliance review panel.  *Id.* § 112.534(1)(a)-(c).  If the compliance review panel sustains the alleged FLEOBOR violation, the agency head must immediately remove the investigator from the investigation and initiate an investigation of the removed investigator.  *Id.* § 112.534(1)(g).

In Count III, Phelps's complaint alleged three FLEOBOR violations: (1) Sheriff Ramsay violated Fla. Stat. § 112.532(1)(d)[1]

---

[1] Phelps's complaint alleged a violation of "§ 112.533(1)(d)," but this appears to be a scrivener's error—there is no "§ 112.533(1)(d)" in the FLEOBOR.  And

because he "did not interview all identifiable witnesses and/or gather all evidence"; (2) Sheriff Ramsay violated Fla. Stat. § 112.532(4)(a) when he "moved [Phelps] from supervision [of] the [Treehouse] Murder case on October 4, 2019"; and (3) both Sheriff Ramsay and attorney Higgins violated Fla. Stat. § 112.533(4) when they "released and discussed information that was part of an open internal affairs complaint" and discussed those matters "with various news media and other sources of publication." Count III alleged that as a result of the three FLEOBOR violations, Phelps suffered both economic and noneconomic harms and sought damages in excess of $75,000.

The district court dismissed Count III, finding that the FLEOBOR does not create a private right of action for money damages.

On appeal, Phelps argues that the district court's dismissal of Count III was error. Thus, we must determine whether the FLEOBOR provides a general cause of action for money damages for violations of the FLEOBOR.

For almost 40 years, courts consistently have found that § 112.534 provides the exclusive remedy for violations of the FLEOBOR. *See, e.g., McQuade v. Fla. Dep't of Corr.*, 51 So. 3d 489, 494-95 (Fla. Dist. Ct. App. 2010); *Sylvester v. City of Delray Beach*, 584 So. 2d 214, 215-16 (Fla. Dist. Ct. App. 1991); *City of Mia. v. Cosgrove*,

---

based on the contents of the allegation, it appears Phelps intended to cite § 112.532(1)(d).

14                    Opinion of the Court                    23-11299

516 So. 2d 1125, 1127-28 (Fla. Dist. Ct. App. 1987); *Kamenesh v. City of Mia.*, 772 F. Supp. 583, 593 (S.D. Fla. 1991), *abrogated on other grounds by Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1303 (11th Cir. 2001); *see also McRae v. Douglas*, 644 So. 2d 1368, 1375 n.6 (Fla. Dist. Ct. App. 1994) ("[S]everal district courts of appeal have held that the [FLEOBOR] does not create a statutory right for damage suits against the employer agency and that the *sole* remedy against an employer agency for violation of section 112.532 is injunctive relief provided for in section 112.534."). Likewise, this Court, albeit in an unpublished decision, has concluded that § 112.534 provides the sole remedy for violations of the FLEOBOR. *Diaz v. Mia.-Dade Cnty.*, 849 F. App'x 787, 793 (11th Cir. 2021). That is because § 112.534 "is the only remedy provision of Part VI of Chapter 112, and thus the only express remedy provision applicable to alleged" violations of the FLEOBOR. *See Cosgrove*, 516 So. 2d at 1127 (citing the rule of statutory construction "*expressio unius est exclusio alterius*: where one thing is expressed and others are not, the Legislature is presumed to have intended to omit the items not expressed").

In short, § 112.534 establishes a compliance review process. *See* Fla. Stat. § 112.534. It does not create a cause of action for damages for violations of the FLEOBOR. *See id*. Therefore, (1) the FLEOBOR does not provide a money damages remedy, (2) the sole remedy for FLEOBOR violations is the review process outlined in § 112.534, and (3) the district court did not err in dismissing Phelps's FLEOBOR claim.

While the exclusive remedy provided for in § 112.534 has changed over time, the remedy has never included a civil claim for damages, and the reasoning of these cases applies with the same force to the current iteration of § 112.534. *Compare* Fla. Stat. § 112.534 (1987) (providing for injunctive relief), *with* Fla. Stat. § 112.534 (2021) (providing for a compliance review process). Section 112.534 remains the only remedy provision of the FLEOBOR, and thus the only express remedy provision applicable to alleged breaches of the FLEOBOR. *See* Fla. Stat. § 112.531, *et seq.*

On appeal, Phelps argues that we should disregard Florida's intermediate appellate court decisions because they reached their conclusion that § 112.534 provides an exclusive remedy "without any real statutory analysis." But we can find no error in these courts' straightforward statutory analysis. The FLEOBOR—as codified in Part VI (§§ 112.531 to 112.536)—contains only one provision, § 112.534, that addresses an officer's remedy for violations of the FLEOBOR's other provisions, and that remedy does not include money damages. Thus, we agree with the Florida courts that the Florida legislature did not intend to create a civil action for damages for violations of an officer's rights under the FLEOBOR. *See Cosgrove*, 516 So. 2d at 1127.

Phelps tries to get around Florida's proscription of money damages for FLEOBOR violations. Phelps argues that her claim for money damages for violations of the FLEOBOR is authorized by Fla. Stat. § 112.532(3). But § 112.532(3) does not address FLEOBOR violations.

16                    Opinion of the Court                    23-11299

Section 112.532(3) provides that "[e]very law enforcement officer or correctional officer shall have a right to bring civil suit" for money damages in only the following three circumstances: (1) for damages "suffered during the performance of the officer's official duties"; (2) "for abridgment of the officer's civil rights arising out of the officer's performance of official duties"; or (3) "for filing a complaint against the officer which the person knew was false when it was filed." Fla. Stat. § 112.532(3). Section 112.532(3) explicitly states that it "does not establish a separate civil action against the officer's employing law enforcement agency for the investigation and processing of a complaint filed under this part."[2] Importantly, violations of the FLEOBOR are not violations of civil rights guaranteed by the constitution or the laws of Florida. *See Bailey v. Bd. of Cnty. Comm'rs*, 659 So. 2d 295, 299-301, 307 (Fla. Dist. Ct. App. 1994) (indicating in a case in which a former

---

[2] Section 112.532(3) states in full:

> Every law enforcement officer or correctional officer shall have the right to bring civil suit against any person, group of persons, or organization or corporation, or the head of such organization or corporation, for damages, either pecuniary or otherwise, suffered during the performance of the officer's official duties, for abridgment of the officer's civil rights arising out of the officer's performance of official duties, or for filing a complaint against the officer which the person knew was false when it was filed. This section does not establish a separate civil action against the officer's employing law enforcement agency for the investigation and processing of a complaint filed under this part.

Fla. Stat. § 112.532(3).

corrections officer alleged FLEOBOR violations that § 112.532 "creates no cause of action for damages" for claims for (1) "alleged abridgement of" and (2) "alleged conspiracy to abridge" an officer's civil rights guaranteed by the constitution and the laws of Florida).

While Phelps's complaint cites numerous provisions of the FLEOBOR, it does not contain a single citation to § 112.532(3). Furthermore, Count III of Phelps's complaint does not allege that she suffered damages (1) during the performance of official duties, (2) for certain abridgments of her civil (as opposed to FLEOBOR) rights, or (3) because a person knowingly filed a false complaint against her.[3]  *See* Fla. Stat. § 112.532(3).

---

[3] Because Phelps's complaint does not allege a violation of § 112.532(3), we need not, and do not, address whether this provision creates a new civil action or merely acknowledges an officer's right to bring already existing claims. *Compare D'Agastino v. City of Mia.*, 220 So. 3d 410, 417 n.4 (Fla. 2017) ("Section 112.532 also provides for . . . a statutory right to bring a civil action for damages arising from false complaints . . . ."), *with Cosgrove*, 516 So. 2d at 1129 ("[A]s we read [§ 112.532(3)], [it] has nothing whatsoever to do with the employee's rights vis-a-vis his employer but simply memorializes that a policeman shall have the right to sue *other persons* for damages suffered by the officer *in the performance of his official duties*."), *and Sylvester*, 584 So. 2d at 216 ("Subsection (3) of 112.532 does not create a new civil action. Rather, it recognizes that officers have independent claims which are not impeded by this statute."), *and Kamenesh*, 772 F. Supp. at 593 (stating the statute merely memorializes the right to sue but does not create a cause of action).  *See also Mesa v. Rodriquez*, 357 So. 2d 711, 713 (Fla. 1978) (stating § 112.532(3) "simply declares that law enforcement officers have a right to recover damages suffered during performance of their official duties," but also stating that "the statute confers on Mesa no right to sue for defamation greater than any right he possesses under Florida law without it").

On appeal, Phelps claims, without citing the record, that she alleged that Higgins filed complaints to abridge her civil rights and knowingly filed false complaints. We can find no such allegations in Phelps's complaint, much less in Count III. While Phelps's complaint alleged that Higgins filed two complaints that resulted in internal affairs investigations—one for the twenty MCSO employees appearing at Tucker's scheduling conference and the other for directing Malone to act like a white supremacist while stopping Wilson—Phelps did not allege that either of Higgins's complaints was false or was filed to abridge Phelps's civil rights in some way. Rather, as outlined above, Phelps's FLEOBOR claim contains nothing more than alleged violations of the FLEOBOR's investigation requirements and confidentiality provisions, and thus does not allege a violation of § 112.532(3). *See Bailey*, 659 So. 2d at 301, 307.

## B.    Defamation Against the Individual Defendants

Phelps brought a defamation claim against each of the Individual Defendants for statements they made to the media and on social media. The district court granted summary judgment for the Individual Defendants, finding that Phelps failed to offer evidence that the Individual Defendants' statements were published with actual malice.

"In analyzing [Phelps's] defamation claims, we apply Florida's substantive law." *See Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018). But "[b]ecause of the expressive freedom guaranteed by the First Amendment, a defendant may not be held

liable for defaming a public figure about a matter of public concern unless he is shown to have acted with actual malice." *Berisha v. Lawson*, 973 F.3d 1304, 1310 (11th Cir. 2020) (quotation marks omitted).

Phelps does not dispute that she was a public figure or that her alleged wrongful conduct or lack of fitness for duty were matters of serious public concern. *See Smith v. Russell*, 456 So. 2d 462, 463-64 (Fla. 1984) (holding that a police officer is a public figure as a matter of law); *City of Mia. v. Wardlow*, 403 So. 2d 414, 415-16 (Fla. 1981) (explaining the public importance of "communicating the results" of a police department's internal investigations and "ensur[ing] no unfit persons were allowed to serve as police officers"). Instead, Phelps asserts that a genuine issue of material fact exists as to whether the Individual Defendants acted with actual malice.[4]

Because she is a public figure, Phelps must show by clear and convincing evidence that the Individual Defendants acted with actual malice toward her. *See Berisha*, 973 F.3d at 1312. "That is, [s]he must be able to show—well beyond a preponderance of the evidence—that the [Individual Defendants] published a

---

[4] In her reply brief, Phelps argues for the first time that the district court erred in finding that Phelps's complaint did not state a claim for defamation *per se*. We do not address arguments advanced by an appellant for the first time in a reply brief. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 682-83 (11th Cir. 2014). Because Phelps failed to raise an argument regarding defamation *per se* in her opening brief, that argument has been forfeited. *See id.*; *United States v. Campbell*, 26 F.4th 860, 871-72 (11th Cir. 2022) (en banc).

defamatory statement either with actual knowledge of its falsity or with a high degree of awareness of its probable falsity." *Id.* (quotation marks omitted). This subjective test "asks whether the publisher *in fact* entertained serious doubts as to the truth of his [or her] publication" and "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *Id.* (quotation marks omitted).

To begin, Phelps contends that evidence regarding "Project Mayhem" showed that the Individual Defendants intended to cause Phelps to lose her job or to otherwise harm her. Evidence regarding the existence of "Project Mayhem" is insufficient to show actual malice. Even if the Individual Defendants implemented "Project Mayhem" to harm Phelps, the existence of such a plan fails to establish that the Individual Defendants "entertained serious doubts as to the truth of [their] publication[s]." *See Berisha*, 973 F.3d at 1312; *see also Edward Lewis Tobinick, MD v. Novella*, 848 F.3d 935, 947 (11th Cir. 2017) (concluding that evidence of "ill will" on the part of a defendant was insufficient to establish actual malice).

Next, as to only Tucker, Phelps points to two false statements: (1) that Phelps instructed an officer to *illegally* pull over Wilson and (2) that there were audio recordings of Phelps talking about setting Tucker up. As to the first statement, Phelps argues that, based on Tucker's access to the audio recording regarding the "Detroit" ruse, he knew Phelps instructed Malone to make a "legal stop." As to the second statement, Phelps argues that a "reasonable

juror could conclude Tucker knew" there were no audio recordings of Phelps talking about setting Tucker up.

As the district court explained, evidence that Phelps told Malone to make a legal stop does not mean her ruse necessarily would have been conducted legally or prove that Tucker thought what Phelps said to Malone on the recording was legal. Phelps has not put forth any evidence tending to show that Tucker in fact thought the proposed ruse was legal. In fact, the record evidence establishes the opposite. On December 11, 2019, Tucker posted on Facebook: "While the acting like a racist may be legal, telling the officer to pull him over for some imagined infraction, is not." This evidence suggests Tucker believed, rightly or wrongly, that what Phelps proposed to Malone was illegal.

Finally, Phelps has failed to offer any evidence, other than her own opinion, that Tucker entertained serious doubts or was highly aware that his statements regarding Phelps setting him up were false.

After a review of the record, we conclude that the district court properly found insufficient evidence to create a jury issue as to actual malice.

## C. Tortious Interference with a Business Relationship

Phelps brought a tortious interference with a business relationship claim against the Individual Defendants. The district court dismissed this claim without prejudice, finding that the Individual Defendants' complaints to the MCSO were privileged

and protected by law, by virtue of "citizens['] constitutional right to petition for redress," and thus not actionable.

To state a claim for tortious interference with a business relationship under Florida law, a plaintiff must establish: (1) the existence of a business relationship between the plaintiff and a third party; (2) the defendant's knowledge of the relationship; (3) the defendant's "intentional and unjustified interference with the relationship"; and (4) damages resulting from the defendant's interference. *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994).

Phelps alleged that the Individual Defendants "acted in a [concerted] fashion as part of 'Project Mayhem' with the stated purpose of discrediting [Phelps] and having her removed from her employment with the [MCSO]." Project Mayhem, a plan allegedly hatched by Tucker and Jenai, "included filing multiple Internal Affairs complaints against [Phelps] so that when questioned at Tucker's murder trial, [Phelps] would have to respond that [she was] subject to Internal Affairs investigation[s]."[5]

---

[5] Phelps argues that her claim for tortious interference with a business relationship was also based on certain statements made by the Individual Defendants to the media and on social media, but her argument is belied by the allegations in the complaint, which tie Project Mayhem to only the internal affairs complaints and to Higgins's use of the MCSO memo in a court filing. This issue was identified by the district court when it dismissed Phelps's tortious interference claim without prejudice, but Phelps did not amend her complaint to remedy this pleading deficiency. We agree with the district court's reading of the complaint. Because Phelps did not amend her complaint, after being alerted to her failure to tie Project Mayhem to media

23-11299                Opinion of the Court                23

Under Florida law, petitions for the redress of grievances are *conditionally* privileged as a matter of law.[6] *Londono v. Turkey Creek, Inc.*, 609 So. 2d 14, 18 (Fla. 1992); *see also Nodar v. Galbreath*, 462 So. 2d 803, 809-10 (Fla. 1984); *Mesa v. Rodriguez*, 357 So. 2d 711, 712-13 (Fla. 1978). If the grievances "were made for a proper purpose in light of the interests sought to be protected by legal recognition of the privilege—then there can be no recovery." *Nodar*, 462 So. 2d at 810. The burden is on the plaintiff to show that the privilege does not apply, which requires a showing of actual malice where the plaintiff is a public official.[7]    *See Londono*,

---

and social media statements, we will not consider those statements in analyzing her tortious interference claim. Phelps also argues that her tortious interference claim was based on certain statements made by the Individual Defendants that were not included in the complaint at all. Our review of her tortious interference claim, which the district court dismissed for failure to state a claim, is limited to the allegations contained in the complaint. *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009). Therefore, we will also not consider those statements in analyzing Phelps's tortious interference claim.

[6] Under the federal Constitution, the Petition Clause does not provide for absolute immunity from suit for damages. *See McDonald v. Smith*, 472 U.S. 479, 483 (1985). But to overcome the Petition Clause immunity for a citizen's petition on a matter of public concern, a plaintiff must show that the defendant acted with "malice" as defined in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). *See id.* at 485; *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 389, 398 (2011). This provides the floor of constitutional protection for the right of petition, not the ceiling. *See McDonald*, 472 U.S. at 485. States are free to grant broader immunity under state law. *See id.*

[7] *Londono* also seems to suggest that when a defendant asserts that his or her alleged tortious interference was privileged under the right to petition the government, the plaintiff must show that the statements were false. *See*

609 So. 2d at 18-19 (concluding a complaint that alleged the defendants made intentional and malicious false statements to others for purposes of harming the plaintiff's economic interests sufficiently alleged that the defendants abused their conditional privilege). Under Florida law, a police officer is deemed a public figure as a matter of law. *Smith*, 456 So. 2d at 463-64.

Actual malice requires the plaintiff to show, by clear and convincing evidence, (1) "knowledge of falsity" or (2) "reckless disregard of truth or falsity." *Nodar*, 462 So. 2d at 806. Phelps's complaint does not allege that the internal affairs complaints were false. Therefore, she cannot establish actual malice through knowledge of falsity. Phelps's complaint also does not allege that the Individual Defendants recklessly disregarded the truth or falsity of the internal affairs complaints. Because Phelps did not allege facts showing actual malice, the Individual Defendants' complaints about Phelps to the MCSO were conditionally privileged under Florida law. *Cf. Londono*, 609 So. 2d at 18-19. Accordingly, we affirm the district court's dismissal of Phelps's tortious interference claim against the Individual Defendants. *See PDVSA US Litig. Tr.*, 65 F.4th at 562.

### III.   CONCLUSION

For the foregoing reasons, we affirm the district court's dismissal of Phelps's (1) FLEOBOR claim against Sheriff Ramsay

---

609 So. 2d at 20. As discussed below, because we conclude that Phelps has not alleged actual malice, we do not address whether *Londono* requires a showing of falsity.

and attorney Higgins, (2) defamation claim against Sheriff Ramsay, and (3) tortious interference claim against the Individual Defendants and grant of summary judgment (4) for Sheriff Ramsay on Phelps's Title VII claim, (5) for Sheriff Ramsay on Phelps's § 1983 claim, (6) for the Individual Defendants on Phelps's defamation claims, and (7) for the Individual Defendants on Phelps's civil conspiracy claim.

**AFFIRMED.**